**UNITED STATES v. HELLER et al.**

No. 4356.

District Court, D. Maryland.

Aug. 18, 1932.

Simon E. Sobeloff, U. S. Atty., and Charles G. Page, Asst. U. S. Atty., both of Baltimore, Md.

Walter L. Clark, William A. Grimes, and Clater W. Smith, all of Baltimore, Md., B. Tracy Ansell, of Washington, D. C., and Stuart S. Janney, of Baltimore, Md., for defendants.

CHESNUT, District Judge.

The suit in this case is by the United States of America against Capt. E. J. Heller, and the Maryland Casualty Company, which is the surety on his official bond, and the testimony shows that Capt. Heller, who has been in the military service of the government, in various capacities, for the last thirty-six years, was, in 1924, appointed a disbursing officer for the government, stationed in France, in the matter of the liquidation of various obligations that the United States had incurred there in connection with the war, known as the World War, in 1917 and 1918. Now Capt. Heller's duties of office, as recited in the bond, which is given by the Maryland Casualty Company as his surety, was that he should carefully discharge the duties to which he was assigned, and faithfully expend all public moneys and honestly account for the same and for all public property which shall or may come into his hands without fraud or delay. And the effect of the bond was that, if he did that, then the bond was to be discharged from any further obligation.

He continued to be the disbursing officer of the government in France until, I think, March 31, 1928, and his accounts of receipts of money and disbursements of money were embraced in monthly accounts current which were forwarded in due course to the Comptroller General's Office, and a summary of his accounts shows that during the period of approximately four years that he was in France he handled for the government $1,-997,643.40. His disposition of all that money was approved by the Comptroller General, with the exception of three separate items amounting, in the aggregate, to $18,051.50,

and it is the contention of the government in this case that that amount of money which was disallowed from the payments that Capt. Heller had made, disallowed by the Comptroller General, should be paid back by Capt. Heller. Of course, the bond is in the maximum penalty of $10,000, so that the government, suing on the bond, would not be able to recover in this case more than the amount of the bond, and interest on the sum from the time it was due. That question becomes immaterial, in view of the fact that I find that the plaintiff is not entitled to recover at all. The government says that these three items of $18,051.50 were improperly paid out by Capt. Heller, and therefore he did not faithfully pay over the moneys of the United States which came into his hands. Under the law, it is clearly the duty of the office of the Comptroller General to question items paid out by disbursing officers which, on the face of the papers which accompany the payments, seem to be irregular or contrary to law, and it is because the Comptroller General's Office thought that the payment in this case amounting to the $18,000 was irregular and not justified by law that it refused to approve the accounts to that extent, and, under the statute (see 31 USCA § 72), the Comptroller General is charged with the duty of seeing that there is some formal investigation, at least, in regard to the propriety of those items—hence this suit—and, of course, it is the duty of the court in a case of this kind to apply the testimony to the pleadings in the case and see whether the government has made out its case, and that requires some little analysis of the testimony with regard to these three separate transactions.

Now, I will take them up in the order of their financial importance: The first transaction concerns the payment by Capt. Heller of $16,300 some time, I think, early in 1928 (on the express order of the War Department), for the purchase of caskets for the reburial of soldiers of the United States who had died in action, or died in service in France in the World War, and who had been buried in France, and whose burials, somewhat hurriedly at the time, were to be revised so that the cemeteries should present a more dignified and symmetrical and beautiful, if it is possible to use that word in this connection, appearance, as a sentiment to our soldiers who had died for their country. Now the government says that Capt. Heller should not have made that payment of $16,-300, and they point to the fact, the alleged fact, that the contract under which the pay-

ment was made was irregular, or not authorized, and that the War Department in making this contract, and in ordering Capt. Heller to pay out the money, acted illegally—at least, that was the prima facie objection that was made by the Comptroller General's Office. The facts are within a fairly narrow compass, and they are that shortly after the war the government found that it had a large surplus of caskets which it had bought for interment purposes of soldiers. At that time it was not thought they would be needed—they were declared surplus material—and in due course they were sold to a concern known as the Lincoln Surplus Company, and that company, apparently, did not carry through the purchase, but undertook to assign the contract, and the War Department permitted the assignment, or acquiesced in it, and joined in making a new contract to a new purchaser known as one Hering, and Hering bought some 2,190, I think, caskets from the government at $4 apiece, and then later on Hering took delivery of 550 of those caskets, for which he paid $4 each, plus the cost to him of the carrying charges across the Atlantic Ocean to the United States, which amounted to about another $4 per casket, and, when the first consignment of caskets arrived, he accepted and paid for it, but found, due to their exposed condition to the weather, some of them had deteriorated, and in shipment they were further damaged, and he made a complaint about it, and asked to have the time of delivery of the other remaining caskets extended so that he could have certain repairs made to them in France. Well, for one reason or another, the time was extended, and in January, I think, of 1928, the situation was that Hering was still the purchaser, on paper at least, of these caskets, and the government was considering whether it should revise its policy about reburial of soldiers. In this connection you will remember that Capt. Heller's recommendation, through Col. Van Dyne, who was in charge of cemeteries or graveyards in France for America, was that the ordinary reburial boxes used by the French for the burial or reburial of their soldiers were adequate, the price of them comparatively small, a few dollars per box, but the American Legion, when it learned of this proposed action by the War Department, claimed that was not suitable and inconsistent with the dignity of the treatment of the remains of American soldiers. The War Department, in yielding to that recommendation of the American Legion, decided to change its policy, and to therefore acquire caskets of the regular form and size for re-

mains of the various soldiers who were to be reburied. That made quite a change in the situation in regard to the caskets. They were no longer surplus material, but they were very much needed by the government for the purpose of immediate use in order to save the accumulation of further expense in keeping the forces of the United States in France which were necessary for the purpose of the reburial, and the War Department, apparently, as has been explained to you in the testimony of Major General Cheatham, advertised for bids for caskets, and they were unable to obtain offers except here in America at the rate of $30 a casket, and that would have entailed, of course, considerable delay in getting the caskets to Europe and the transportation charges. At this time General Cheatham found there were available, in the hands of Hering, the purchaser from the government, some 1,600 or more caskets which were immediately available in France, and the War Department then determined that it would be a saving to the government to buy these caskets back from Hering, even though it gave Hering a substantial profit of $10 on each casket, but as Major General Cheatham said, it was saving the government $16 or more per casket. So the War Department acted in that emergency situation, after bids had already been made and had been unsatisfactory and were rejected, and they sent a cable to Capt. Heller, dated February 2, 1928, which says, "Reject all bids for caskets and reburial cases. Purchase by negotiations from Hering 1630 caskets at $14 each." Capt. Heller acted on that, and he made the purchase of the caskets. They were used by the government and the soldiers were reburied, and the caskets are now in the soil of France.

The government's contention is that the action of the War Department in making this bargain in repurchasing the caskets was unauthorized by law because certain statutes (see 41 USCA § 5) required the purchase should be made only after bidding, that these caskets were bought directly from the holder, or Hering, who was in control of them, apparently without special bidding for them. The statute, however, refers to the authority of officers of the government, in cases of emergency, to make purchases directly in the open market. From the circumstances which have been fully explained by Major General Cheatham, it does not seem to me that there is any evidence in this case that I would be warranted in submitting to you to determine whether the action of the War Department as such was invalid. It seems to me, as a

matter of law, that the circumstances were such as to bring the transaction clearly within the statute with regard to emergency transactions. It seems to me there could be no reasonable criticism of what the War Department did by virtue of hindsight as opposed to foresight. I was rather impressed, as I think you all were, with the fact that Major General Cheatham was apparently acting very patriotically and loyally in the interest of the United States in making the transaction.

 Government counsel suggest there are some technical objections to the transaction. They point to statutes of the United States (see 41 USCA § 15) which say that a contract made with an original purchaser may not be assigned, and that this original sale of the caskets was to the Lincoln Surplus Company, and it was assigned, with the approval of the War Department, to Hering, and that Hering really never had any title to the caskets, that he ought never to have been allowed to be the purchaser in the first place, and that, when he delayed so long in completing his purchase, the War Department ought not to have bought the caskets back from him, but should have forfeited his contract and used the caskets without repurchase. At one point of the trial government counsel suggested that they did not concede that Capt. Heller had acted in good faith in the matter. They pointed to the fact that Capt. Heller had some acquaintance, individually, with Mr. Hering in France, and they rather suggested that, perhaps, there was a job of some kind being put up on the government in this repurchase. Now I have considered this testimony very carefully, indeed, in the light of a proper and loyal accounting of a disbursing officer to the government, and I do not find that the evidence would warrant me in submitting to you any question as to the good faith of Capt. Heller in this matter. He had no part in making the contract and apparently did not recommend it. We have to deal with the evidence as we have it. I can understand the government does not wish to concede points that may be thought by it to be debatable, but, searching the testimony as minutely as I can, I fail to find anything that would warrant me, as a judge of this court, in even submitting to you the question of whether Capt. Heller acted in good faith, and I think it is the duty of the court, when an officer of the government is brought into court and his accounts and actions are challenged, if the testimony fails to give any substantial support to a charge of fraud or of bad faith, I think it is the duty of the court to announce that publicly, as I do now. As to the technical objections, I find no substance in them. After the Lincoln Surplus Company defaulted, a new contract was made by the War Department with Hering. And Major Dinsmore, the legal adviser to the War Department, gave the opinion to Major General Cheatham that Hering was not legally in default under his contract. So that I do not find any legal justification for submitting to you the issue as to whether Capt. Heller properly paid out this $16,300. It seems to me that on the evidence he was warranted in doing so, and that he acted carefully, faithfully, without fraud or delay.

 Now, the next item that is challenged in the account is an item of $1,500, which grows out of the payment to a certain Lieut. De Ram, who was apparently a French military officer, and who, some time prior to 1918, had made a contract with the government of the United States whereby he was to be paid $30 for each camera that the government of the United States manufactured in following his patent or device, and, apparently, there were two contracts made by the government of the United States back in 1918 with this Lieut. De Ram, one for the manufacture by the government of some two hundred cameras, and the other for the manufacture of fifty cameras, and $30 per camera was to be paid for such as were made by the government. Now, what transpired after that and while Capt. Heller was disbursing officer was this: De Ram had made a claim on the government for the payment of the royalty that was due him. The testimony is that De Ram himself did not know how many cameras the government had made, but naturally he made claim for as much as he could think of—at all events, he made a claim in a blanket sum, apparently. Now that claim was passed on by the Secretary of War, acting under the authority of an act of Congress known as the Dent Act (50 USCA § 80 note), which gave the Secretary of War the right to settle claims against the government growing out of war matters, and the Secretary of War, through his proper assistants, decided that De Ram was entitled to $7,500, and instructions were issued to Capt. Heller, some time in 1925, in which he was told to pay $7,500 in satisfaction of this claim to De Ram, to take De Ram's receipt for it, and to account for it in the ordinary way. The final letter of instruction was dated January 10, 1925, which has been offered in evidence on behalf of the defendant. It is a clear statement that reads as follows: "Referring

to paragraph 2, 9th indorsement, this office, dated September 25, 1924— (file A.S.–604–L.I.Q.), there is enclosed for your information a copy of 1st indorsement, this office, this date, to the Chief of Air Service, requesting that a liability charge be made against Procurement Authority F.C.S. 1 P–2546 A3 in the sum of $7,500 for the payment of the claim of G. de Ram. Payment of the claim should now be made and, when paid, the papers requested in the indorsement described above forwarded to this office. By order of the Assistant Secretary of War.

"John Mather,
"Major, Ordnance Department (DOL),
"Chief, Disposal Branch,"

—together with an attached paper.

Capt. Heller (who knew nothing whatever of this matter, had no personal acquaintance with Lieut. De Ram, never heard of him apparently, before receiving these instructions), knew nothing of his claim other than appears in the papers in which he was instructed to pay it, got in touch with De Ram, paid him the $7,500, took his receipt, and forwarded it to the accounting office with his monthly accounts current. The government says that payment was wrong, not to the extent of $7,500, but to the extent of $1,500, and they based that, apparently, on two contentions, or they had based it on two contentions at the outset of the case: One was that the authority under the Dent Act to the Secretary of War to make this settlement had expired at the time it was made, and that there was no continuing appropriation in existence at the time the payment was made, but it developed here just this morning that counsel for the defense (being specially interested in the matter), were able to find a special appropriation which did extend the fund to the time when the payment was made. Of course, that objection, I understand, has disappeared from the case. The other objection which was made, and which is still made by the government, is that this payment to the extent of $1,500 is illegal because one of the contracts for cameras, to wit, the one for fifty cameras, had been canceled prior to the payment, and that the government never manufactured more than two hundred cameras, and at $30 a camera there would only be due to De Ram for royalties $6,000, and therefore the payment of $30 for each of fifty cameras not manufactured was unlawful. Now it seems that this supplemental contract for fifty cameras was, in fact, canceled before the payment was made. Capt. Heller knew nothing at all about that, and,

apparently, it was a mistake of some kind in the office of the War Department in recommending the claim as a $7,500 claim instead of a $6,000 claim. But, as I say, the evidence fails to show that Capt. Heller knew anything at all about the matter, and he acted in accordance with his instructions. In the absence of any evidence tending to show that he was in any way personally responsible for the mistake, it seems to me, as a matter of law, this mistake cannot be visited upon him or the surety on his bond. He made diligent efforts to recover the overpayment as soon as the War Department instructed him to do so. He was unable to. I am unable to find any legal basis for holding him liable for that payment of the $1,500. He acted entirely according to his instructions without any knowledge of facts which would seem to indicate that the payment was invalid. The government contends there was an affirmative duty on him, Capt. Heller, to ascertain the number of cameras that had actually been made and used by the War Department some seven or eight years prior thereto. I do not find that Capt. Heller had that duty in connection with the matter. I think there is no legal basis for holding him liable for having made the payment as expressly directed by the War Department.

The other matter that is left for consideration is possibly not entirely so clear. At the same time, I think the same principles which are applicable to the other payments must govern here. While Capt. Heller was disbursing officer in France, there were presented to him from time to time by various officers of the government in the War Department who had been assigned to Europe, possibly to France, to study languages, orders of the Adjutant General of the War Department, which gave to these officers the allowance of 50 cents a day for certain expenses. That was covered by a letter of authority, dated June 22, 1927, signed by the Adjutant General and addressed to First Lieutenant Robert W. Raynsford, Signal Corps (and to others), and it tells him that he is authorized in lieu of reimbursement for actual and necessary expenses to receive the payment of a flat per diem of 50 cents, exclusive of transportation charges while in Europe. It is authorized under the provisions of A. R. 35–4820. Now, from time to time, as I say, these orders of the War Department to these various officers who were students in France, students of languages, were presented to Capt. Heller, and he honored them and paid the amounts which, in

the aggregate, only come to $251. The government says that that was a mistaken order of the War Department and that the statutes, of which there are a number, which have been carefully scrutinized, in legal effect, did not authorize the payment of 50 cents, or any sum, per day, to any officer of the United States, unless he was traveling, and that, as these officers were directed to proceed from Washington to Paris, they presumably were assigned to Paris and expected to stay in Paris, and, as there was no evidence presented to Capt. Heller that they were authorized to travel any place other than Paris, therefore they had no occasion to put in any traveling expense items, even up to 50 cents a day. Capt. Heller says, as a matter of fact, he knows that these various students were not limited in their studies of languages to Paris, but that they did travel in the South of France and elsewhere, and the orders, anyhow, do not limit them to Paris, but they are broad enough to cover their stay anywhere in Europe, which would seem to imply that they were not absolutely tied down to Paris. Now my attention is called to a special section of an act of Congress known as the National Defense Act (section 127a, as added and amended [10 USCA § 535]), which authorized the Secretary of War to detail various officers and enlisted men for a certain period of their enlistment to serve the United States in the capacity of learning foreign languages, in which American soldiers, naturally, are generally somewhat deficient, and information and knowledge of which is certainly very useful in the War Department among its officers and personnel. That act does contemplate some allowance to these officers while they are studying. The contention of the government, however, is that that statute, construed in connection with other statutes, justifies an allowance only when they are, in fact, traveling. The matter is, perhaps, not free from all possible doubt as to the law, but I have not been able to find any question of fact which I can properly submit to you. Counsel on both sides, I think, rather agree it is a question of law, and I must take the responsibility of saying whether, under the facts that are in the testimony, Capt. Heller acted properly in obeying the orders of the War Department in making these payments, and I think he did.

While the result of this case is that I am directing you to find a verdict for the defendant, you will understand, of course, that the suit is brought pursuant to a sense of duty by the Comptroller General, who did not feel satisfied, on the papers submitted to him, that the payments were entirely regular. It is the duty of the Comptroller General to question payments that do not seem to be regular, and it is true, undoubtedly, that public officers, handling funds of the government, are held to a very high degree of responsibility—they are, in fact, said to be insurers of the funds that come into their hands. That, I understand, to mean, if they put them in a bank where they are not authorized to put them, or if they keep them in a safe, if the bank fails or robbers rob the safe, or a fire destroys the money, the public officers are, nevertheless, liable to the government for it. It is a harsh responsibility that is imposed as a matter of public policy. Then there are circumstances under which a public officer is responsible for a dereliction of duty on the part of his subordinate, although he himself is perfectly blameless; and there are other cases where harsh legal liabilities are put upon public officers of the United States handling public money. There is, however, some redress given them when they have been without legal fault to make recovery against the United States through the Court of Claims. I find, through the diligence of Mr. Page, in calling my attention to certain statutes, that in the Navy there is a statute which says that, if a naval pay officer disburses money in good faith, and with ordinary diligence, but wrongfully, the Secretary of the Navy can take the responsibility for it and entirely exempt the pay officer, and, apparently, there was, at one time, such a statute applicable to the War Department, but that is no longer in existence, or has expired by limitations.

I have earnestly sought for the principle that ought to be applied in determining the standard of liability of an officer, such as Capt. Heller, in a case of this kind, and the principle which I think is sound, and which I have endeavored to apply to this case, I find is announced most clearly in a decision in this court in 1909, by a very distinguished predecessor judge of this court, the Honorable Thomas J. Morris. It is a case of this general nature, in that it was a suit by the government of the United States on the official bond of S. Davies Warfield, who was postmaster in Baltimore, as many of you remember, back in the early part of this century. This suit came on and was tried in 1909. The point there was that on the pay roll of the postmaster at Baltimore there was the name of a clerk who, it was alleged by the government, was paid by the postmaster, but who did not, in fact, perform services for the government, at the place at least where

he was expected to perform them, and some thousands of dollars had been paid out, I think, by Postmaster Warfield by checks payable to this man who was on the pay roll, and the government said that was an improper payment. Mr. Warfield's defense was that the man was not put on the pay roll by himself, but, by orders of the Post Office Department in Washington, they were his superiors, and he had to do what they said, that, in so far as he personally knew, he did not know whether the man was actually in Baltimore or in Washington, or where, that he never personally came in contact with the man, but he did know that very often clerks on the pay roll acted as secret service men, and, naturally, they would not be visible, or notoriously about, and it may very well be that the man, as far as he knew, was properly on the pay roll and performing services which did not bring him into open and known contact with other officers of the Department here in Baltimore. In other words, Mr. Warfield said: "I acted in entire good faith and on the orders of the First Assistant Postmaster General, who, by the law, is entitled to give me orders, and I think that I should not be held responsible." Judge Morris said that was so, and he used this expression: "But the numerous reported cases in which this law has been enforced as against parties receiving money illegally paid by a public officer do not cover a case in which innocently and in good faith a disbursing agent, upon an apparently lawful claim and by direction of his superior officer charged with the duty of instructing him, makes a payment in good faith, out of moneys in his hands which should properly and legally be applied to the payment of the claim if it had no concealed element of illegality. I have not found a reported case in which an innocent disbursing agent has been held liable under such circumstances. It hardly seems that the financial operations of the government could go on if at the peril of refunding the money every subordinate was required to exercise his own judgment as to whether an apparently legal claim which his superior directed him to pay was to be paid or not. That the person wrongfully obtaining the money should be liable to refund to the government, no matter by what innocent mistake of law or fact he obtained it, is well settled as one of the risks of dealing with the government. * * * But it would seem that the position of an innocent agent who by direction disburses the government's money should be different, and the responsibility, so far as liability for the disbursement is concerned,

should rest where the responsibility to decide is placed by the rules and regulations established by law."

And the Circuit Court of Appeals for this circuit, in an excellent opinion by Judge Pritchard, held that Judge Morris had correctly determined the law in that case (170 F. 43, 45).

I have not been able to find that that case, which was decided in 1909, has ever been disapproved or criticized by the Supreme Court of the United States or, indeed, by any other federal court of equal or higher authority. It seems to me that that principle, which was announced by Judge Morris and confirmed by the Circuit Court of Appeals in 1909 (170 F. 43), is not only good law but good policy, and ought to be applied in this case. I have read some later decisions of the Circuit Court of Appeals, particularly a recent case decided by the court, speaking though Judge Northcott, and reported under the name of Fidelity & Deposit Company v. United States, 55 F.(2d) 100, where a collector of internal revenue was held liable, but in that case a statute was contravened, apparently in good faith, but the collector nevertheless endeavored to evade the application of the statute. In other words, he knew he was trying to get around or evade the statute. The court said that could not be permitted. The principle which I think is deducible, from all the cases that I have seen, is this: That, where a disbursing officer knows that a payment that he is making is against the statute, he makes the payment at his peril, even though he acts in good faith and he believes in the interest of the government, because we all must obey the statutory law. And, again, where the disbursing officer has knowledge of facts which indicate to him that a payment would be clearly improper, it is hardly a defense for him to say that he acted on the instructions of a superior officer, because, if the thing is really wrong, and he knows it to be wrong and illegal under the facts that he knows, then he cannot defend his conduct by saying, "Oh, well, somebody told me I could do it."

But, as in this case, as I view the testimony, where the disbursing officer acts in good faith, where he has no knowledge of facts which make the payment seemingly illegal, and where he has no knowledge of any statute being violated, and where there is no statute, so far as the court can find, that clearly applies to this case, then the disbursing officer is not liable for the payment which he makes on expressed directions of his su-

perior officer, even though, on a close analysis of all the statutes, comparison of all the facts, it might subsequently be held by some other department of the government that a mistake had been made by the superior officer. I think that is a doctrine of law laid down by Judge Morris and confirmed by the Circuit Court of Appeals (170 F. 43) as binding on me, and should be applied by me, and has been endeavored to be applied by me in this case.

I want to say that I am indebted to counsel in the case for the help they have given me in deciding a subject-matter that is rather new and which does not often come into the courts. I thank you for your patient attention to the case, and I will now discharge you from further service, and ask you to render a verdict for the defendant under the instructions of the court. Exceptions are noted on behalf of the government to all adverse rulings.

Mr. Page: May it please the court, I would ask the court to include further, in view of the fact that the court has said that the government has taken the position at the first part of the case that there was fraud involved, in justice to Capt. Heller, I want to say that the government is now persuaded that there is no fraud in the case, and that there will be no allegation, so far as that is concerned, of fraud.

The Court: I think that is a very proper statement, Mr. Page, and one that reflects credit upon your impartiality and attention to the testimony in the case.